**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CHANTAL ATTIAS, et al.**, | |
| Plaintiffs, | |
| v. | Case No. 15-cv-882 (CRC) |
| **CAREFIRST, INC., et al.**, | |
| Defendants. | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

After Washington, D.C.-area health insurance company CareFirst, Inc. suffered a data

breach in 2014, which exposed the names, birth dates, email addresses, and subscriber

identification numbers for over a million of the company's insureds, Plaintiffs brought this

putative class action lawsuit, alleging (as relevant here) claims for breach of contact and

violations of the respective Consumer Protection Acts of Maryland and Virginia.  Having

concluded discovery, Plaintiffs now seek to certify three classes, one for each of those causes of

action, under Federal Rule of Civil Procedure 23.  The core of Plaintiffs' claims is that the

CareFirst data breach exposed them and the millions they seek to represent to an increased risk

of fraud and identity theft, requiring them to spend time and money on mitigating measures, such

as purchasing credit monitoring services and the like.

For the following reasons, the Court concludes that Plaintiffs have satisfied the Rule

23(a) prerequisites to class certification.  But the Court has serious concerns about whether

common issues will predominate over individual inquiries in this case.  Specifically, in light of

the Supreme Court's recent decision in <u>TransUnion LLC v. Ramirez</u>, 141 S. Ct. 2190 (2021),

which held that a risk of future harm standing alone does not constitute a concrete Article III

injury in damages actions, the Court suspects that Plaintiffs' proposed classes, as currently

defined, would impermissibly sweep in large numbers of un-injured class members.  Plaintiffs

may yet be able to demonstrate that narrowing their class definitions in light of TransUnion (if

necessary) will not overwhelm this case with individualized inquiries.  But because the briefing

before the Court now does not address these concerns, the Court will deny Plaintiffs' motion for

class certification, without prejudice to renewal.

## I.    Background

As this Court has explained in three prior opinions, Plaintiffs in this case are residents of

the District of Columbia, Maryland, and Virginia who were customers and insureds of Defendant

CareFirst, Inc., which offers health insurance to more than one million individuals in those states.

Second Am. Class Action Compl. ("SAC") ¶¶ 1–8, 23, 25; see also Attias v. CareFirst, Inc.

(Attias I), 199 F. Supp. 3d 193 (D.D.C. 2016); Attias v. CareFirst, Inc., 365 F. Supp. 3d 1

(D.D.C. 2019); Attias v. CareFirst, Inc., 518 F. Supp. 3d 43 (D.D.C. 2021).

In April 2014, hackers gained access into CareFirst's internal data system through an

email-based spear phishing campaign, in which the hackers sought to install a backdoor into

CareFirst's internal data systems through an email designed to resemble one from a company

employee conveying a software update.  Mot. for Class Cert. Ex. 1 at 3; id. Ex. 2 at 119–24,

131–32.  Although CareFirst initially identified the spear phishing email as a fake and took some

precautionary measures to limit any data exposure, one CareFirst employee followed the link

provided in the email, downloaded the hackers' backdoor, and unwittingly gave them access to

some of CareFirst's systems.  Mot. for Class Cert. Ex. 2 at 139–45, 193–95.  Plaintiffs maintain

that CareFirst committed a host of errors that allowed the hackers to access the company's data

and remain undetected for a prolonged period of time, including failing to reset passwords on

certain company accounts, disable local administrator accounts, perform a password reset for

certain web applications, install two-factor authentication, and implement other measures that would have prevented the hackers' backdoor from remaining installed.  Mot. for Class Cert. at 3; id. Ex. 2 at 232–36.

As a result of the data breach, hackers accessed the following information from individual CareFirst customers: customer first and last (and sometimes middle) names, their subscriber ID numbers, dates of birth, email addresses, and usernames used to log into CareFirst's online member portal.  Mot. for Class Cert. Ex. 2 at 281–82; id. Ex. 1 at 4.  Although Plaintiffs' complaint also alleges that CareFirst collects other personal information, such as customer social security numbers and credit card numbers, SAC ¶ 27, Plaintiffs do not at this stage contend that the hackers accessed any such information, nor does the record suggest as much, see Mot. for Class Cert. Ex. 1 at 4; id. Ex. 2 at 225–26.  After it learned of the extent of the data breach, in May 2015, CareFirst sent breach notification letters to all affected customers and offered them two free years of credit monitoring and identity-theft protection through Experian's ProtectMyID Alert service.  See Opp. to Class Cert. Mot. Ex. C.

A month later, in June 2015, Plaintiffs initiated this class action lawsuit, filing an amended complaint in July 2015.  The complaint alleged several causes of action stemming from CareFirst's handling of the data breach, including, as relevant here, breach of contract and violations of the Maryland and Virginia Consumer Protection Acts ("MCPA" and "VCPA").  SAC at 18–19; id. ¶¶ 100–16.  Along with an increased risk of identity theft, the complaint alleged that Plaintiffs and CareFirst members similarly situated to them "have or will have to spend significant time and money to protect themselves" from the risk of identity theft, including "the cost of responding to the data breach, the cost of acquiring identity theft protection and

3

monitoring, cost of conducting a damage assessment, mitigation costs," and the like.  Id. ¶¶ 17–19.

In 2016, the Court granted CareFirst's motion to dismiss Plaintiffs' complaint for lack of standing, holding that Plaintiffs had pleaded only a speculative risk of identity theft stemming from the breach.  See Attias I, 199 F. Supp. 3d at 199–203.  The D.C. Circuit reversed.  See Attias v. CareFirst, Inc. (Attias II), 865 F.3d 620 (D.C. Cir. 2017).  Specifically, the Circuit held that Plaintiffs had pleaded "a substantial risk of identity theft as a result of CareFirst's alleged negligence in the data breach."  Id. at 627–29.  Although premised partially on Plaintiffs' allegations that the data breach "exposed customers' social security and credit card numbers," the Circuit also observed that the theft of members' names, birth dates, email addresses, and subscriber identification information alone created a risk of "'medical identity theft' in which a fraudster impersonates the victim and obtains medical services in her name."  Id. at 628.

On remand, CareFirst filed a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  See Attias v. CareFirst, Inc. (Attias III), 365 F. Supp. 3d 1 (D.D.C. 2019).  This Court initially concluded that all of the named Plaintiffs except for two—Kurt and Connie Tringler of Maryland—had failed to allege actual damages necessary for their breach of contract and consumer protection claims and therefore dismissed the complaint as to all Plaintiffs except the Tringlers.  Id. at 8–17, 27.  Upon Plaintiffs' motion for reconsideration, however, the Court revived those claims as to all Plaintiffs.  See Attias v. CareFirst, Inc. (Attias IV), 518 F. Supp. 3d 43 (D.D.C. 2021).  With respect to the breach of contract claim, the Court observed that "there is a conflict within the caselaw" as to whether "proof of actual damages is an element of a [D.C.] contract claim," with some cases holding that "the absence of specific monetary injury does not prevent the accrual of a cause of action for breach of contract," which

4

may permit an award of nominal damages even absent evidence of other monetary damages.  <u>Id.</u> at 52 (alteration in original) (citations omitted).  With respect to Plaintiffs' MCPA and VCPA claims, after noting that no court in either Maryland or Virginia had "addressed whether expenses incurred to mitigate the risk of future identity theft qualify as 'actual damages' absent any actual misuse of the plaintiff's exposed data," the Court surveyed each state's case law and concluded that, absent any binding authority to the contrary from either state, it would treat mitigation expenses as actual damages sufficient to state MCPA and VCPA claims.  <u>Id.</u> at 55–57.

Plaintiffs have now moved to certify three classes under Federal Rule of Civil Procedure 23.  First, Plaintiffs ask to certify a Contract Class composed of all CareFirst members residing in the District of Columbia, Maryland, and Virginia whose personally identifiable information, personal health information, sensitive personal information, and other financial information was breached as a result of the CareFirst data breach.  <u>See</u> Mot. for Class Cert. at 10.  Second, Plaintiffs seek to certify two separate classes—the Maryland Consumer Class and Virginia Consumer Class—consisting of Maryland and Virginia CareFirst members whose information was exposed as a result of the data breach.  <u>Id.</u>

## II.    Legal Standards

The party seeking certification of a class under Rule 23 "bears the burden of persuasion, and must show that the putative classes meet the requirements of Rule 23 by a preponderance of the evidence."  <u>Garnett v. Zeilinger</u>, 301 F. Supp. 3d 199, 204 (D.D.C. 2018) (Cooper, J.).  To meet that burden, the moving party "must first meet the four requirements set forth in Rule 23(a)," which permits class certification only if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

and (4) the representative parties will fairly and adequately protect the interests of the class."
Hoyte v. District of Columbia, 325 F.R.D. 485, 489 (D.D.C. 2017) (Cooper, J.) (quoting Fed. R.
Civ. P. 23(a)).  "Additionally, some courts have imposed an 'implied' fifth requirement that the
class be adequately defined and clearly ascertainable—the purpose of which is to 'require[]
plaintiffs to be able to establish that the general outlines of the membership of the class are
determinable at the outset of litigation.'"  Id. (quoting Thorpe v. District of Columbia, 303
F.R.D. 120, 139 (D.D.C. 2014)); see J.D. v. Azar, 925 F.3d 1291, 1320 (D.C. Cir. 2019) ("[O]ur
court has not addressed whether Rule 23 contains an ascertainability requirement for class
certification . . . .").

In addition to satisfying the Rule 23(a) prerequisites to class certification, the moving
party must "then choose a type of class action under Rule 23(b) and meet the requirements of
that class type as well."  Hoyte, 325 F.R.D. at 491.  Where, as here, a party seeks to certify a
class under Rule 23(b)(3), the Court must find that the party has satisfied both predominance and
superiority requirements, that is, "that the questions of law or fact common to class members
predominate over any questions affecting only individual members" and "that a class action is
superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed.
R. Civ. P. 23(b)(3).

### III.  Analysis

Before turning to the requirements of Rule 23, the Court must begin by addressing the
potential impact on this case of the Supreme Court's recent decision in TransUnion LLC v.
Ramirez, 141 S. Ct. 2190 (2021), with respect to Plaintiffs' standing to sue.  After concluding
that Plaintiffs still have standing, the Court will turn to the Rule 23 requirements, keeping in
mind the impact of TransUnion's more-restrictive vision of concrete Article III injury.

A.  Standing After TransUnion v. Ramirez

In a footnote in its opposition brief, CareFirst suggests that the Court "may wish to reconsider whether the named Plaintiffs have Article III standing" in light of the development of the record and the Supreme Court's 2021 decision in TransUnion v. Ramirez, 141 S. Ct. 2190 (2021).  Opp. at 7 n.4.  Although both this Court and the D.C. Circuit have already analyzed Plaintiffs' standing in this case at length, see Attias I, 199 F. Supp. 3d 193 (D.D.C. 2016); Attias II, 865 F.3d 620 (D.C. Cir. 2017), because standing goes to subject matter jurisdiction over the case, the Court has "an affirmative obligation to ensure" that intervening case law has not deprived Plaintiffs of standing, Smallwood v. U.S. Dep't of Just., 266 F. Supp. 3d 217, 219 (D.D.C. 2017) (Cooper, J.) (quoting Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001)).

TransUnion involved a class action against one of the "Big Three" credit reporting agencies.  141 S. Ct. at 2201.  Beginning in 2002, TransUnion introduced a product called "OFAC Name Screen Alert."  Id.  OFAC, the Treasury Department's Office of Foreign Assets Control, maintains a list of "specially designated nationals" who threaten America's national security (including, for instance, terrorists and drug traffickers), and TransUnion's Name Screen product employed a name-comparison technology to flag on individuals' credit reports when, based on his or her name, the individual was a "potential match" for a name on the OFAC list. Id.  Because Name Screen relied on name similarities alone, TransUnion erroneously listed thousands of individuals as security threats.  Id.  Sergio Ramirez was among those individuals, and after a Nissan dealership refused to sell him a car when his credit report flagged him as potentially included on the OFAC list, he filed a class action lawsuit against TransUnion under the Fair Credit Reporting Act ("FCRA").  Id. at 2201–02.

Ramirez alleged three FCRA violations:  (1) that TransUnion failed to follow reasonable procedures to ensure the accuracy of information in his credit file; (2) that TransUnion failed to provide him with all the information in his credit file upon request, as required by the statute, because the company sent OFAC-alert-related information in a separate mailing; and (3) that TransUnion failed to provide a summary of rights with its mailings to consumers regarding their potentially matching with the OFAC list.  Id. at 2202.  On behalf of himself and a class of 8,185 other consumers, Ramirez prevailed at trial and won a jury verdict totaling more than $60 million.  Id.  The parties stipulated before trial, however, that of the 8,185 consumers with erroneous OFAC designations, only 1,853 had their credit reports disseminated by TransUnion to potential creditors during the class period.  Id.  For the 6,332 other class members, TransUnion had maintained internal credit files erroneously listing them as security threats but had not actually disseminated the erroneous reports.  Id. at 2200, 2202.

Reviewing these claims after the jury verdict, the Supreme Court held that the "6,332 class members whose credit reports were not provided to third-party businesses did not suffer a concrete harm" and therefore lacked standing.  Id. at 2214.  First, when evaluating what "makes a harm concrete for purposes of Article III," the Court explained that an alleged injury must bear a "close relationship" to a harm "traditionally" recognized as providing a basis for a lawsuit in American courts.  Id. at 2204.  That is, plaintiffs must identify "a close historical or common-law analogue for their asserted injury."  Id.  Applying those standing principles to TransUnion's erroneous OFAC designations, the Court held that, with respect to the 1,853 class members whose reports were actually disseminated to third-party businesses, their injury was sufficiently analogous to "the reputational harm associated with the tort of defamation" to constitute a concrete Article III injury.  Id. at 2208.

"The remaining 6,332 class members," however, told "a different story."  Id. at 2209.

With respect to those consumers, the Court reasoned that the "mere presence of an inaccuracy in

an internal credit file, if it is not disclosed to a third party, causes no concrete harm."  Id. at 2210.

Relying on language from Spokeo Inc. v. Robins, 578 U.S. 330 (2016), plaintiffs maintained that

the 6,332 other class members had standing because of "the risk of real harm" in the future, had

their credit files been disclosed.  TransUnion, 141 S. Ct. at 2210.  Although acknowledging that

"a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to

prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and

substantial," the Court held that in a suit for damages, "the mere risk of future harm, standing

alone, cannot qualify as a concrete harm—at least unless the exposure to the risk of future harm

itself causes a *separate* concrete harm," such as "current emotional or psychological damage."

Id. at 2210–11 & n.7 (citing Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 n.5 (2013)).

Because the 6,332 class members whose reports were not disclosed presented no evidence that

they "were independently harmed by their exposure to the risk" of disclosure, the Court

concluded that they lacked standing.  Id. at 2211.[1]

A number of courts have since applied TransUnion to the data breach context.  For

instance, in Clemens v. ExecuPharm Inc., 48 F.4th 146 (3d Cir. 2022), the Third Circuit

explained that, in light of TransUnion, "the mere existence of a common law analog for the

asserted harm does not necessarily end" the standing inquiry, id. at 155.  Rather, "[f]ollowing

TransUnion's guidance," the court held "that in the data breach context, where the asserted

---

[1] Although the Court also stated that "[e]very class member must have Article III standing in order to recover individual damages," it did not "address the distinct question whether every class member must demonstrate standing *before* a court certifies a class."  Id. at 2208 & n.4.

9

theory of injury is a substantial risk of identity theft or fraud, a plaintiff suing for damages can satisfy concreteness as long as he alleges that the exposure to that substantial risk caused additional, currently felt concrete harms," such as emotional distress caused by the knowledge of the risk of identity theft or the expenditure of "money on mitigation measures like credit monitoring services."  Id. at 155–56; see also, e.g., Ortiz v. Perkins & Co., No. 22-cv-3506-KAW, 2022 WL 16637993, at *4 (N.D. Cal. Nov. 2, 2022) ("The Court finds that by itself, the risk of increased future harm is not sufficient to establish standing post-TransUnion.  The Court, however, finds that the time spent dealing with the harm is a cognizable injury where, as here, the information stolen could be used to commit identity theft."); In re Mednax Servs., Inc., Customer Data Sec. Breach Litig., 603 F. Supp. 3d 1183, 1203 (S.D. Fla. 2022) (assessing "whether allegations of emotional distress, coupled with the substantial risk of future harm, are sufficiently concrete to establish standing in a claim for damages" in light of TransUnion); Bowen v. Paxton Media Grp., LLC, No. 5:21-CV-00143-GNS, 2022 WL 4110319, at *4 (W.D. Ky. Sept. 8, 2022) (holding that TransUnion created "a two-part test to determine when the risk of harm gives rise to Article III standing when: (1) there is material risk of concrete harm; and (2) plaintiffs can demonstrate 'some other injury' they suffered stemming from this risk").[2]

---

[2] In addition to the post-TransUnion data breach cases requiring some showing of concrete injury beyond the risk of future fraud or identity theft, some courts have inquired separately about whether the fact of the data breach itself might bear a sufficiently close relationship to a concrete but intangible harm at common law, "for example, reputational harms, disclosure of private information, and intrusion upon seclusion."  TransUnion, 141 S. Ct. at 2204; see, e.g., I.C. v. Zynga, Inc., 600 F. Supp. 3d 1034, 1048–50 (N.D. Cal. 2022) (asking whether data breach bears sufficiently "close relationship to harms caused by the common law private torts of disclosure of private facts and intrusion upon seclusion"); Leonard v. McMenamins, Inc., No. 2:22-CV-00094-BJR, 2022 WL 4017674, at *4–5 (W.D. Wash. Sept. 2, 2022) (comparing data breach harm to tort of "disclosure of private information").  Since TransUnion, however, Plaintiffs have not advanced the argument that the breach in this case, standing alone, inflicted a concrete injury along the lines of these common law torts.  Their theory of injury, consistent with the D.C. Circuit's decision on standing, rather appears to be that

Returning to Plaintiffs' allegations here, the D.C. Circuit held that Plaintiffs had alleged a concrete injury based on the substantial risk of medical or identity fraud following the CareFirst data breach.  Attias II, 865 F.3d at 627–28.  That conclusion, however, predates the Supreme Court's instruction in TransUnion that a mere risk of future harm, on its own, does not constitute a concrete injury.  As a general rule, of course, district judges "are obligated to follow controlling circuit precedent until either [the D.C. Circuit], sitting en banc, or the Supreme Court, overrule it."  Vijender v. Wolf, No. 19-CV-3337 (APM), 2020 WL 1935556, at *3 (D.D.C. Apr. 22, 2020) (alteration in original) (quoting United States v. Torres, 115 F.3d 1033, 1036 (D.C. Cir. 1997)).  But "[c]ontrolling precedent may be 'effectively overruled'" if "a later Supreme Court decision 'eviscerates' its reasoning."  Id. (quoting Brookens v. Acosta, 297 F. Supp. 3d 40, 47 (D.D.C. 2018)); see also Nat'l Treasury Emps. Union v. FLRA, 30 F.3d 1510, 1516 (D.C. Cir. 1994) (noting exception to law of the case doctrine "when an intervening interpretation of the law has been issued by a controlling authority").  Here, the Supreme Court's holding in TransUnion has effectively overruled the Circuit's prior holding in this case that Plaintiffs' future risk of identity theft or medical identity fraud, even if substantial, constitutes a concrete injury, without more.  See Attias II, 865 F.3d at 628–29.

As TransUnion instructs, therefore, the Court must determine whether "the exposure to the risk of future harm" in this case has itself "cause[d] a *separate* concrete harm."  TransUnion,

_____

the breach created a risk of future fraud requiring preventative measures.  See Reply at 4–5. Without briefing on the question, the Court will not sua sponte conclude that Plaintiffs or the class suffered a concrete injury for Article III purposes based on a common-law-analog theory, particularly because the courts that have conducted that analysis have emphasized that "in data breach cases, courts must examine the nature of the specific information at issue to determine whether privacy interests were implicated at all" and have found no common-law analog where, as here, the breached information included names, contact information, email addresses, and usernames.  Zynga, 600 F. Supp. 3d at 1048–50.

141 S. Ct. at 2210–11.  In so doing, the Court agrees with the reasoning of <u>Clemens</u> and the other cases discussed above that the expenditure of time or money on mitigation measures in response to a data breach, such as purchasing credit monitoring services or taking other steps to prevent fraud, may create a concrete Article III injury when paired with a risk of future identity theft. Applying that standard here, the Court concludes that the named Plaintiffs have both alleged standing and have provided evidence to support that allegation, even after <u>TransUnion</u>.  <u>See id.</u> at 2208 ("A plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation'" (quoting <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 561 (1992)).[3]

    First, as the Circuit observed when analyzing the redressability prong of the standing analysis, "Plaintiffs allege that they have incurred" costs stemming from the data breach, including "the cost of responding to the data breach, the cost of acquiring identity theft protection and monitoring, [the] cost of conducting a damage assessment, [and] mitigation costs."  <u>Attias II</u>, 865 F.3d at 629 (alterations in original); <u>see</u> SAC ¶ 19.  Further, the evidence Plaintiffs submitted to accompany their motion for class certification supports the contention that they spent some time or money undertaking at least some mitigating measures after the CareFirst breach to prevent potential fraud.  Plaintiff Chantal Attias, for instance, stated in her deposition that she purchased credit monitoring services in response to the breach.  Mot. for Class Cert. Ex. 9 at 38–39.  Other named plaintiffs, although they did not pay for identity theft monitoring services out of pocket, took the time to enroll in the free service offered by CareFirst or spent some amount of time talking with their financial institutions about possible fraud.  <u>See id.</u> Ex. 10

---

[3] As discussed further below, however, the Court has concerns that the classes Plaintiffs wish to certify, as currently defined, would include a great many individuals without standing.

at 21–25 (Lisa Crider deposition, stating she enrolled in free protection); id. Ex. 11 at 32–40 (Connie Tringler deposition, stating she enrolled in the free protection and dealt with possible tax fraud); id. Ex. 12 at 19–20 (Curt Tringler deposition, stating he enrolled in free protection and contacted a lawyer after the breach); Opp. to Mot., Ex. H at 4 (Richard Bailey, stating he purchased credit monitoring services after the breach).[4]

Although the Court concludes that the named Plaintiffs have standing despite the intervening change of law, TransUnion also has implications for the scope and composition of the classes Plaintiffs seek to certify.  Although TransUnion did not disturb this Circuit's case law that only "the individual named plaintiffs [must] have standing" at the class certification stage, Garnett v. Zeilinger, 323 F. Supp. 3d 58, 65 (D.D.C. 2018) (Cooper, J.), standing may nevertheless be relevant to class certification in other respects, see, e.g., 1 Newberg on Class Actions § 2:3 (6th ed. 2022) (stating that a class should not be "defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct" (quoting Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 824 (7th Cir. 2012))); 1 McLaughlin on Class Actions § 4:28 (19th ed. 2022) (Although only named plaintiffs must demonstrate standing, "[t]he Second, Eighth, and D.C. Circuits require

---

[4] The Court is less certain, however, that Plaintiff Andreas Kotzur was affected by the CareFirst breach at all.  Kotzur stated in discovery that he purchased credit monitoring from Equifax after learning of the CareFirst breach.  Opp. Ex. E at 4.  But he also stated in his interrogatory responses that he did not have an active subscriber ID and login to the CareFirst portal between June 2014 and May 2015, when hackers had access to the database.  Id. at 2. According to the deposition of a CareFirst representative, only CareFirst members who used the CareFirst online portal were impacted in the data breach.  Id. Ex. A at 224:6–9; see also Mot. for Class Cert. Ex. 1 at 4.  It seems possible, then, that Kotzur may not have faced any risk of fraud from the data breach.  Because the parties have not focused their briefing on whether Kotzur's personal information was, in fact, a part of the breach at all, the Court will reserve judgment on that question and will continue to accept the allegation in the complaint that Kotzur was injured, at least for now.

that in order for a class to be certified, the class must be defined such that anyone within it would have standing to pursue the claim").  Accordingly, without demanding individualized evidence of classwide standing at the certification stage, some circuits apply the rule that a class must "be defined in such a way that anyone within it would have standing." Denney v. Deutsche Bank AG, 443 F.3d 253, 263–64 (2d Cir. 2006); accord In re Deepwater Horizon, 739 F.3d 790, 801 (5th Cir. 2014).

Because the D.C. Circuit has addressed concerns about the existence classwide injury in fact in the context of Rule 23(b)'s predominance requirement, see In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869, 725 F.3d 244, 252–53 (D.C. Cir. 2013), the Court will proceed to determine whether Plaintiffs have satisfied the Rule 23(a) prerequisites to class certification before turning to the implications of TransUnion when evaluating predominance under Rule 23(b).

B.  Rule 23(a) Factors

Turning to the substance of Plaintiff's motion for class certification, the Court first assesses whether Plaintiffs have satisfied the Rule 23(a) prerequisites of numerosity, commonality, typicality, adequacy of representation, and ascertainability.  As a reminder, Plaintiffs move to certify three separate classes: a D.C., Maryland, and Virginia breach of contract class, a Maryland consumer class, and a Virginia consumer class.  Plaintiffs propose the following class definitions:

**The Contract Class:** All persons who reside in the District of Columbia, the State of Maryland and the Commonwealth of Virginia and have purchased and/or possessed health insurance from Carefirst, Inc., Group Hospitalization and Medical Services, Inc., Carefirst of Maryland, Inc., and/or Carefirst BlueChoice and whose personally identifiable information, personal health information, sensitive personal information, and/or financial information was breached as a result of the data breach announced on or about May 20, 2015.

**The Maryland Consumer Class:** All persons who reside in the State of Maryland, and have purchased and/or possessed health insurance from Carefirst, Inc., Group Hospitalization and Medical Services, Inc., Carefirst of Maryland, Inc., and/or Carefirst BlueChoice and whose personally identifiable information, personal health information, sensitive personal information, and/or financial information was breached as a result of the data breach announced on or about May 20, 2015.

**The Virginia Consumer Class:** All persons who reside in the Commonwealth of Virginia, and have purchased and/or possessed health insurance from Carefirst, Inc., Group Hospitalization and Medical Services, Inc., Carefirst of Maryland, Inc., and/or Carefirst BlueChoice and whose personally identifiable information, personal health information, sensitive personal information, and/or financial information was breached as a result of the data breach announced on or about May 20, 2015.

Mot. for Class Cert. at 10.

### 1. Ascertainability

As noted above, the D.C. Circuit has not decided whether Rule 23 contains an implied ascertainability requirement.  See J.D., 925 F.3d at 1320.  The Court will nevertheless "apply it out of an abundance of caution."  Hoyte, 325 F.R.D. at 489 n.3.  Most federal courts that have recognized an ascertainability requirement have agreed "that ascertainability means that a class definition must render potential class members identifiable according to objective criteria."  In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Pracs. Litig., 422 F. Supp. 3d 194, 241 (D.D.C. 2019) (citing Mullins v. Direct Digital, LLC, 795 F.3d 654, 657 (7th Cir. 2015) ("[A] class must be defined clearly and . . . by objective criteria rather than by, for example, a class member's state of mind.")).  Additionally, a minority of courts have applied a "heightened" ascertainability standard, which requires that "[t]he method of determining whether someone is in the class must be administratively feasible."  Id. (quoting Carrera v. Bayer Corp., 727 F.3d 300, 307 (3d Cir. 2013)).

To the extent an implied ascertainability requirement exists, the Court concludes that it is satisfied in this case.  "[L]ooking at the class definition[s]," the Court "can easily ascertain"

whether potential class members would fall within or without the proposed classes.  Pigford v. Glickman, 182 F.R.D. 341, 346 (D.D.C. 1998).  The proposed classes include all persons who had CareFirst health insurance and whose personally identifiable information was subject to the data breach announced on May 20, 2015, and as CareFirst does not dispute, the membership of that class has already been identified by virtue of the data breach notice letters that the company mailed to its customers.  See Mot. for Class Cert. Ex. 2 at 292–94 (CareFirst representative explaining at deposition that the company ascertained all victims of the breach for purposes of sending notification letters).  Accordingly, the defined classes are readily ascertainable.

### 2.  Numerosity

CareFirst also does not dispute that Rule 23(a)'s numerosity requirement is satisfied. Numerosity requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  Courts have held that numerosity may be presumed with a class of as few as 40 members.  Hoyte, 325 F.R.D. at 490 (first citing Marcus v. BMW of North America, LLC, 687 F.3d 583, 595 (3d Cir. 2012); and then citing Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993)).  Here, the proposed classes, together, number more than one million individuals. See Mot. for Class Cert. Ex. 2 at 224 (breach exposed records for approximately 1.1 million CareFirst users).  Numerosity, therefore, poses no barrier to class certification.

### 3.  Commonality

Plaintiffs have also established commonality.  "To establish commonality under Rule 23(a)(2), a plaintiff must identify at least one question common to all members of the class." Garcia v. Johanns, 444 F.3d 625, 631 (D.C. Cir. 2006).  A shared issue of fact or law satisfies the commonality requirement if it is "capable of classwide resolution—[i.e.,] that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in

one stroke." Cobell v. Salazar, 679 F.3d 909, 922 (D.C. Cir. 2012) (quoting Wal-Mart Stores,

Inc. v. Dukes, 564 U.S. 338, 350 (2011)).  Under this low threshold, "factual variations among

the class members will not defeat" commonality "so long as a single aspect or feature of the

claim is common to all proposed class members." Stephens v. Farmers Rest. Grp., 329 F.R.D.

476, 483 (D.D.C. 2019) (quoting Bynum v. District of Columbia, 214 F.R.D. 27, 33 (D.D.C.

2003)).

    As Plaintiffs point out, this case presents several common questions of law or fact that are

capable of classwide resolution.  For instance, Plaintiffs' breach of contract claim is premised on

the idea that CareFirst breached either an express or implied term of its agreements with its

insureds by permitting hackers to access class members' personal identifying information.  See

Mot. for Class Cert. at 5–6.  Specifically, Plaintiffs point to privacy statements contained in

CareFirst member policies and a Notice of Privacy Practices given to CareFirst insureds upon

enrollment, both of which make certain representations about the company's safeguards for

protecting members' private information.  See id.; id. Ex. 5 (Notice of Privacy Practices); Opp.

Exs. P–S (privacy and confidentiality statements).  Whether those provisions were material terms

of CareFirst's contractual relationship with class members and, if so, whether CareFirst breached

those terms by failing adequately to detect and secure against the data breach in this case are

common questions of law and fact that can be resolved as to the entire class at once.  The same is

true for Plaintiffs' consumer protection classes, as whether these same CareFirst privacy policies

were materially misleading statements under the MCPA and VCPA is a common question

capable of classwide resolution.  See Mot. for Class Cert. at 13–15.

    CareFirst objects that these issues are not capable of classwide resolution because

Plaintiffs' claims "require examination of individual contract language."  Opp. at 8 (quoting In re

Marriott Int'l, Inc., 341 F.R.D. 128, 156 (D. Md. 2022)).  Specifically, CareFirst asserts that the named Plaintiffs' insurance plans contained somewhat different language concerning privacy. Id. at 9–13.  For instance, CareFirst points out that some privacy provisions promised that "[t]he Plan" would comply with laws pertaining to the dissemination or distribution of non-public personally identifiable medical or health related information, whereas others promised that "CareFirst" would comply with such laws.  See id. at 11 n.7.  And whereas some plans promised not to disclose any personally identifiable medical or health information, other plans promised to keep members' medical and claims information "confidential."  Id.

CareFirst does not explain why such minor linguistic variations are material to the commonality of Plaintiffs' breach of contract claims.  All the agreements state, in essence, that the customers' medical and personal records are private or confidential, and a CareFirst representative testified at his deposition that CareFirst's obligations under the Notice of Privacy Practices are the same for all members.  See Mot. for Class Cert. Ex. 2 at 290–91, 302. Accordingly, even if there is some variation across the privacy promises made to potential class members, it is enough that "the relevant terms" are "essentially the same."  See In re Bank of Am. Home Affordable Modification Program (HAMP) Cont. Litig., No. MDL 10-2193-RWZ, 2013 WL 4759649, at *4 (D. Mass. Sept. 4, 2013).  This case, moreover, is quite unlike cases cited by CareFirst arising from the context of mortgage contracts, which either involved thousands of form contracts with individual variations in material language, Gustafson v. BAC Home Loans Servicing, LP, 294 F.R.D. 529, 542–43 (C.D. Cal. 2013), or featured contracts "individually drafted on a case-by-case basis," Campusano v. BAC Home Loans Servicing LP, No. CV 11-4609 PSG JCX, 2013 WL 2302676, at *5 (C.D. Cal. Apr. 29, 2013).  Of course, Plaintiffs may or may not be correct on the merits that CareFirst's privacy statements created

binding contracts that were violated by the data breach, but that question goes to "an assessment of the merits of the case, which is improper in a class certification inquiry." Bynum, 214 F.R.D. at 36. For now, it is enough to show that answering that question would resolve a common question of law or fact for the entire class.

Plaintiffs have also satisfied Rule 23(a)'s commonality requirement as to the consumer protection classes. To prevail on their MCPA and VCPA claims, Plaintiffs must show that CareFirst made a misrepresentation or omission of a material fact. See Clark v. Bank of Am., N.A., 561 F. Supp. 3d 542, 560 (D. Md. 2021); Wash. Cnty. Bd. of Educ. v. Mallinckrodt ARD, Inc., 431 F. Supp. 3d 698, 710 (D. Md. 2020); Galloway v. Priority Imps. Richmond, LLC, 426 F. Supp. 3d 236, 244 (E.D. Va. 2019). Whether CareFirst's Notice of Privacy Practices, which was provided to all prospective class members, see Mot. for Class Cert. Ex. 2 at 290–91, 302, contained a misrepresentation or omission and whether that misrepresentation or omission was material are important questions, common to all class members alike and "susceptible to generalized, class-wide proof," J.D., 925 F.3d at 1321 (quoting Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 463 (2016) (Roberts, C.J., concurring)). CareFirst asserts that Plaintiffs cannot show commonality because proving MCPA and VCPA claims will require a showing of reliance and actual injury or monetary loss, which the company maintains will call for individualized inquiries. Opp. at 13–15. To satisfy the Rule 23(a) prerequisite of commonality, however, Plaintiffs need not show that *every* legal or factual question in the case is capable of classwide resolution. "The presence of a single . . . common question can suffice to satisfy Rule 23(a)(2)." J.D., 925 F.3d at 1321. What matters, and what is satisfied here, is that the resolution of the common issues identified "will advance the litigation." Disability Rts.

Council of Greater Wash. v. Wash. Metro. Area Transit Auth., 239 F.R.D. 9, 26 (D.D.C. 2006) (quoting Sprague v. Gen. Motors Corp., 133 F.3d 388, 397 (6th Cir. 1998)).[5]

    *4. Typicality*

The Rule 23(a)(3) typicality requirement mandates that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  A class representative's "claim is typical if it arises from the same event or practice or course of conduct that gives rise to a claim of another class member where his or her claims are based on the same legal theory."  Nat'l Veterans Legal Servs. Program v. United States, 235 F. Supp. 3d 32, 40 (D.D.C. 2017) (quoting Bynum, 214 F.R.D. at 34). The facts and claims of each class member "need not be identical" to satisfy the typicality requirement.  Howard v. Liquidity Servs. Inc., 322 F.R.D 103, 118 (D.D.C. 2017) (quoting In re APA Assessment Fee Litig., 311 F.R.D. 8, 15 (D.D.C. 2015)).

Here, typicality is readily satisfied because the named Plaintiffs, like the class members, are CareFirst customers whose confidential information was allegedly compromised in the same data breach.  Both the Plaintiffs' claims and those of the class therefore arise "from the same event or practice or course of conduct."  Nat'l Veterans Legal Servs., 235 F. Supp. 3d at 40.

CareFirst objects that named Plaintiffs' claims are atypical because they "have not suffered actual injury" and "to the extent they have, they have not suffered the same injury as each other."  Opp. at 26.  Specifically, CareFirst maintains that of the entire class, only the Tringlers have "alleged actual identity theft caused by the breach."  Id.  This argument, however, misunderstands Plaintiffs' theory of injury.  Although Plaintiffs gesture toward a few instances

---

    [5] The Court separately addresses CareFirst's concerns about individualized reliance, causation, and injury questions below in the context of the Rule 23(b) predominance requirement.  See Opp. at 13–25.

of attempted fraud or identity theft experienced by the class representatives, see Mot. for Class Cert. at 7, Plaintiffs' theory of injury—and their basis for calculating damages—is instead that the CareFirst data breach has created a risk of fraud or medical identity theft which has caused Plaintiffs and the class to undertake "efforts and costs related to mitigation," id.; see also id. at 8 (identifying "relief sought" as "damages for the value of Plaintiffs and class members' time and future out-of-pocket expenses each necessary to mitigate against future nefarious events"). Indeed, Plaintiffs' proposed damages model, based on an expert report attached to their motion for class certification, would assess classwide damages based on the out-of-pocket cost of identity theft monitoring and compensation, at a proposed hourly rate, for the time class members reasonably would have spent mitigating their risk of fraud stemming from the data breach.  See Mot. for Class Cert. Ex. 7 at 11–12, 27–33.

The possibility that a few class representatives might have experienced some form of fraud (a possibility Plaintiffs no longer seem to rely on as any element of their claims) therefore is irrelevant, as both the named Plaintiffs and the class members would seek only damages related to the mitigation of a common risk of fraud.  For that reason, the cases cited by CareFirst which involve class representatives seeking damages for harms distinct from the harms suffered by the rest of the class are inapposite.  See Daskalea v. Wash. Humane Soc'y, 275 F.R.D. 346, 358 (D.D.C. 2011) (finding no typicality where "the members of the proposed class suffered a wide range of deprivations, were provided with different kinds of notice at different points in time, and claim distinct injuries"); Dolmage v. Combined Ins. Co. of Am., No. 14 C 3809, 2017 WL 1754772, at *8 (N.D. Ill. May 3, 2017) (finding no typicality where the named plaintiff claimed "actual damages as a result of the data breach, whereas the vast majority of class members never reported becoming a victim of identity theft").

### 5. *Adequacy*

Finally, Plaintiffs must show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To satisfy the adequacy requirement, "the class representative (i) 'must not have antagonistic or conflicting interests with the unnamed members of the class' and (ii) 'must appear able to vigorously prosecute the interests of the class through qualified counsel.'" J.D., 925 F.3d at 1312 (quoting Twelve John Does v. District of Columbia, 117 F.3d 571, 575 (D.C. Cir. 1997)). The adequacy requirement also takes into account the adequacy of proposed class counsel. Barnes v. District of Columbia, 242 F.R.D. 113, 122 (D.D.C. 2007).

CareFirst does not dispute that Plaintiffs satisfy the adequacy prong of Rule 23(a), and the Court sees no reason to question that the named Plaintiffs would be adequate representatives. "All class members seek substantially similar relief," namely compensation for mitigation costs relating to the CareFirst breach. Id. CareFirst has identified no potential "conflicts of interest between" Plaintiffs "and the class they seek to represent." Hoyte, 325 F.R.D. at 490–91 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997)). Plaintiffs' counsel, moreover, have experience with complex civil litigation and have served as class counsel in other consumer matters. See Mot. for Class Cert. at 17–18.

*       *       *

For the foregoing reasons, the Court concludes that Plaintiffs have satisfied the Rule 23(a) prerequisites to class certification.

### C. Rule 23(b) Factors

In addition to the Rule 23(a) prerequisites, Plaintiffs here must also show that "questions of law or fact common to class members predominate over any questions affecting only

individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

       1.  *Predominance*

Unfortunately for Plaintiffs, the Court has some unresolved questions concerning predominance in this case that, at least for now, preclude class certification.  The Court first will discuss the potential individualized issues pertaining to showing classwide injury in fact before raising concerns surrounding proving classwide reliance for Plaintiffs' MCPA and VCPA classes.

       a.  Injury

Although Plaintiffs need not prove that each element of their claims is susceptible to classwide proof to satisfy the Rule 23(b)(3) predominance requirement, they must show that the "proposed classes are sufficiently cohesive to warrant adjudication by representation."  Howard, 322 F.R.D. at 136 (quoting Amchem, 521 U.S. at 623).  Accordingly, the Court must "give careful scrutiny to the relation between common and individual questions" in the case.  Id. (quoting Tyson Foods, 577 U.S. at 453).  In particular, the predominance inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues."  Tyson Foods, 577 U.S. at 453 (quoting 2 Newberg on Class Actions § 4:50 (5th ed. 2012)).

The Court must now return to the impact of TransUnion v. Ramirez on this case.  Recall that TransUnion held that "the mere risk of future harm, standing alone, cannot qualify as a concrete harm—at least unless the exposure to the risk of future harm itself causes a *separate* concrete harm," such as "current emotional or psychological damage."  141 S. Ct. at 2210–11 & n.7.  Applying TransUnion to the data breach context, courts have held that "where the asserted

theory of injury is a substantial risk of identity theft or fraud, a plaintiff suing for damages can satisfy concreteness as long as he alleges that the exposure to that substantial risk caused additional, currently felt concrete harms," including time or money spent mitigating the risk of future harm.  Clemens, 48 F.4th at 155–56.

Although the Court concluded above that the named Plaintiffs have standing because they have spent at least some amount of time or money protecting against the risk of future identity theft or medical fraud, the proposed classes—as presently defined—would appear to sweep in significant numbers of people who have suffered no injury in fact in light of TransUnion.  Under In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869, 725 F.3d 244 (D.C. Cir. 2013), that state of affairs may pose a serious predominance problem.

In Rail Freight, a group of plaintiffs sought class certification, alleging that they had paid inflated fuel surcharges because of a price-fixing conspiracy hatched by four major freight railroads.  Id. at 247–48.  Reviewing the district court's grant of class certification, the Circuit observed that "the predominance requirement demands more than common evidence the defendants colluded to raise fuel surcharge rates."  Id. at 252.  Rather, the plaintiffs also had to show that they could "prove, through common evidence, that all class members were in fact injured by the alleged conspiracy."  Id.  "Common questions of fact cannot predominate," the Circuit reasoned, "where there exists no reliable means of proving classwide injury in fact."  Id. at 252–53.  There, the plaintiffs had relied on a damages model that purported "to quantify the injury in fact to all class members attributable to the defendants' collusive conduct."  Id. at 252.  Although individualized inquiries concerning the amount of damages, by itself, does not generally preclude a finding of predominance, see Johnson v. District of Columbia, 248 F.R.D. 46, 57 (D.D.C. 2008), the Circuit in Rail Freight took issue with the fact that the expert's

methodology for quantifying injury would "also detect[] injury where none could exist," for instance, by yielding damages even for prospective class members whose shipping rates were negotiated before the alleged conspiracy and who therefore had suffered no injury, <u>Rail Freight</u>, 725 F.3d at 252.  That problem "would shred the plaintiffs' case for certification" because, when "a case turns on individualized proof of injury, separate trials are in order."  <u>Id.</u> at 252–53.

      In light of <u>TransUnion</u>, the Court is concerned that Plaintiffs' classes and proposed damages model suffer from the same flaw identified in <u>Rail Freight</u>.  Plaintiffs' proposed class definitions would sweep in *all* CareFirst customers in the District of Columbia, Maryland, and Virginia whose personal information was put at risk in the data breach—*i.e.*, anyone with a risk of future identity or medical fraud—regardless whether those customers have taken any steps to mitigate their potential exposure to identity or medical fraud (indeed, regardless of whether they were even aware of the data breach).  Plaintiffs' proposed method of assessing damages would likewise "yield[] false positives" with respect to CareFirst members who have not suffered a harm beyond the future risk of identity theft or fraud.  <u>Id.</u> at 253.  Plaintiffs offer an expert accountant report approximating an hourly rate for time class members might reasonably spend mitigating the risk of identity theft, including, for instance, changing passwords, signing up for credit monitoring protection, contacting financial institutions, and the like.  Mot. for Class Cert. Ex. 7 at 27–28.  Based on hourly wage rates for administrative staff or office workers, the expert estimates that a fair hourly rate for this sort of task is $30.13 per hour.  <u>Id.</u> at 12, 30.  The expert suggests that class members could self-report the amount of time they spent on mitigation measures through personal affidavits or claim forms but proposes the Court should presume a bare minimum of four hours per person spent on mitigation.  <u>Id.</u> at 12; Mot. for Class Cert. Ex. 14 at 145–46.  Plaintiffs also seek damages for the out-of-pocket cost of 28 years of identity theft

monitoring of a similar quality to ProtectMyID, which the expert estimates would amount to a little over $2,000 per plaintiff.   Mot. for Class Cert. Ex. 7 at 33.

The problem is not that some individualized inquiry would be necessary to determine the extent of each class member's damages, measured by the amount of time spent on mitigation, but rather that the class definitions would yield a high number of "false positives"—CareFirst customers who have spent no time on mitigation—and would thus require "individualized proof of injury." Rail Freight, 725 F.3d at 253.   The overbreadth of Plaintiffs' proposed class definitions could be cured by, for instance, limiting the classes only to CareFirst customers affected by the data breach who have spent time or money undertaking mitigation measures in response to the breach.   But that revision may prompt its own set of individualized inquiries as well.   For one, it is unclear whether there is a classwide source of proof that could readily show which potential class members undertook mitigation measures at all, and specifically which potential class members acted in response to the CareFirst breach in particular, as opposed to any number of other data breaches in recent years that have prompted a similar need for protective action.   See, e.g., Opp. at 25 (identifying Home Depot and Target data breaches that occurred in a similar time period as CareFirst's breach).   The need to identify which potential class members spent time on mitigation specifically in response to the CareFirst data breach would therefore raise individualized inquiries as to the causation elements of Plaintiffs' breach-of-contract and consumer-protection claims.   See In re Marriott, 341 F.R.D. at 169 ("When considering Plaintiffs' identity fraud and related mitigation theories of harm—which are the relevant theories of harm here—individualized issues related to causation are quite significant."); see also Caesar v. Westchester Corp., 280 A.3d 176, 184 (D.C. 2022) (breach-of-contract claim requires "damages caused by" the breach); Cooper v. GGGR Invs., LLC, 334 B.R. 179, 189 (E.D. Va.

2005) ("[T]he VCPA's plain language . . . requires that a private VCPA claimant show that he relied on the alleged misrepresentations claimed to constitute the prohibited practice, and thus that his loss was caused by the prohibited practice."); Lloyd v. Gen. Motors Corp., 916 A.2d 257, 277 (Md. 2007) ("[T]he consumer must have suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the sellers' misrepresentation" under the MCPA.).

Presumably, to identify which CareFirst customers spent time on protective measures because of the CareFirst breach, Plaintiffs would need to rely on self-reporting from class members.  But as the Plaintiffs' depositions themselves reveal, it can be difficult for people to remember whether they purchased credit monitoring in response to one particular data breach, as opposed to others, or what other protective measures they have taken and at what times.  See, e.g., Mot. for Class Cert. Ex. 9 at 35–40 (Attias deposition testimony regarding credit monitoring purchases).  Additionally, although it is not uncommon for courts to rely on claim forms submitted by class members to determine individual damages post-settlement, see, e.g., 4 Newberg on Class Actions § 12:15 (6th ed. 2022), some courts have cautioned against a reliance on claim forms or affidavits from prospective class members to prove injury in fact or to satisfy an element of a claim, see, e.g., In re Asacol Antitrust Litig., 907 F.3d 42, 51–56 (1st Cir. 2018) (reversing grant of class certification where district court proposed permitting class members to submit claim forms along with data and documentation to determine injury, citing concerns about administrative feasibility and defendant's Seventh Amendment rights); Marcus, 687 F.3d at 594 ("[S]imply having potential class members submit affidavits that" their product had become defective "may not be 'proper or just.'" (quoting Xavier v. Philip Morris USA, Inc., 787 F. Supp. 2d 1075, 1089–90 (N.D. Cal. 2011))).

Another complication, which the parties do not discuss, is the potential disconnect in this case between class members' risk of future injury, on the one hand, and the types of mitigation measures on which Plaintiffs' injuries are premised.  As stated above, Plaintiffs no longer appear to contend, nor does the record suggest, that any social security or credit card numbers were leaked in the breach.  See Mot. for Class Cert. at 5 (listing extracted data, including only names, dates of birth, usernames, subscriber IDs, and email addresses); see id. Ex. 1 at 4 (Mandiant investigation report listing CareFirst "member data" subject to breach, which does not include social security or credit card numbers); id. Ex. 2 at 225–26 (CareFirst representative deposition, stating that consumer social security numbers were not in the database subject to the breach).  If social security and credit card numbers were not included in the data breach, then the Court remains unconvinced that there is any realistic risk of identity theft, tax fraud, or credit card fraud stemming from the CareFirst breach.  In this motion, at least, Plaintiffs do not explain how the compromised information could lead to such forms of identity theft.  As noted above, the theft of information like subscriber ID numbers, names, and dates of birth could conceivably lead to a risk of a particular form of medical identity theft.  But Plaintiffs have not explained how many of the mitigation measures they posit reasonable class members might take—including "costs associated with notifying financial institutions and retaining professional credit monitoring services," Mot. for Class Cert. at 24, or "implementing credit freezes," id. Ex. 7 at 29—would relate to combatting the much narrower form of medical identity theft potentially implicated here.

Because the parties have not addressed the Court's concern, in light of TransUnion, that risk of future harm alone is insufficient to create injury in fact, the briefing at present does not grapple either with the logistical hurdles of identifying class members who were injured or

determining what kinds of mitigation measures might qualify an individual for class membership. Nor have the parties provided any guidance about how to proceed if the class definitions in this case were narrowed only to include CareFirst members who were harmed beyond the risk of future injury. The Court therefore raises these questions but will not definitively resolve in this opinion whether Plaintiffs might still successfully show predominance in this case. For the time being, at least, the Court cannot conclude that the common issues predominate over individualized inquiries, at least as the class is currently defined.

### b. Reliance for MCPA and VCPA Claims

The Court also has unresolved concerns relating to classwide reliance under the MCPA and VCPA. As stated above, reliance on the defendant's misrepresentation is a necessary element of Plaintiffs' claim under both the MCPA and VCPA. See Lloyd, 916 A.2d at 277; Owens v. DRS Auto. Fantomworks, Inc., 764 S.E.2d 256, 260–61 (Va. 2014). As the Advisory Committee's notes to Rule 23 suggest, "courts often deny Rule 23(b)(3) class certification in basic fraud cases (and other reliance-related cases) on the grounds that the individualized nature of the reliance inquiry means the predominance test cannot be met." 2 Newberg on Class Actions § 4:58 (6th ed. 2022) (footnotes omitted); see also Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment ("[A]lthough having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.").

As Plaintiffs point out, a number of federal courts have held that classwide reliance on a misrepresentation may be presumed under the MCPA because the materiality of the misrepresentation is judged objectively, from the point of view of a reasonable consumer. See In re Marriott, 341 F.R.D. at 159–60; accord Tait v. BSH Home Appliances Corp., 289 F.R.D. 466,

483 (C.D. Cal. 2012); In re TD Bank, N.A. Debit Card Overdraft Fee Litig., 325 F.R.D. 136, 161–62 (D.S.C. 2018).  Neither party, however, discusses the significance of the decision of the Court of Appeals of Maryland (now called the Supreme Court of Maryland) in Philip Morris Inc. v. Angeletti, 752 A.2d 200 (Md. 2000), which points in the opposite direction.  Reviewing a state-court class certification decision under rules that parallel Federal Rule of Civil Procedure 23, the court in Philip Morris observed that "the legal nature of" the plaintiff's "statutory cause of action under various provisions of the" MCPA "tipp[ed] the scales of the predominance inquiry" against certification.  Id. at 234.  "The unsuitability of such claims for class treatment," the court explained, "arises from the burden placed on [the plaintiffs] of proving individual reliance upon [the defendant's] alleged misrepresentations and material omissions" regarding tobacco products.  Id.  The court deemed reliance to be both a "necessary precondition to awarding" MCPA damages and an "issue unique to each putative class member, thus adding extra weight to the predominance of individual over common questions."  Id. at 234–35; see also id. at 235–36 ("Prospective class members may have heard or read some, all or none of the misrepresentations allegedly made by Petitioners [and] in making the decision to purchase and use Petitioners' tobacco products, each member may have relied heavily, slightly or not at all on the various, arguably deceitful sales pitches, multimedia denials and assertions, and otherwise public claims of Petitioners with respect to their tobacco products.").

None of the federal cases on which Plaintiffs rely, which hold that reliance may be presumed under the MCPA, grapple with this language in Philip Morris.  Nor have the parties addressed this conflict in their briefing.  Plaintiffs, moreover, did not explore in their reply brief whether classwide reliance may be presumed under the VCPA.  The Court has identified some federal cases holding that classwide reliance in VCPA cases might be inferred under certain

circumstances, such as "when there is a long-term marketing campaign to which the class

members were all exposed" or "when the misrepresentation at issue was clearly presented to

every class member, such as when it was on the label of a consumer product that every class

member purchased." In re Hardieplank Fiber Cement Siding Litig., No. 12-MD-2359, 2018 WL

262826, at *17 (D. Minn. Jan. 2, 2018); see also Sonneveldt v. Mazda Motor of Am., Inc., No.

819CV01298JLSKES, 2022 WL 17357780, at *31–32 (C.D. Cal. Oct. 21, 2022) (concluding

that "individualized showings of reliance are not required to prove actual reliance under" the

VCPA when claims "arise from a common course of conduct").

Here, however, Plaintiffs have not yet identified evidence that CareFirst's alleged

misrepresentations about privacy are of the sort that could justify a classwide inference of

reliance.  The representations underlying Plaintiffs' MCPA and VCPA claims are the Notice of

Privacy Practices provided to CareFirst members at enrollment and the terms of members'

contracts regarding the company's privacy obligations.  See Reply at 17; Mot. for Class Cert. at

5–6.  It is not obvious that these representations are analogous to "a long-term marketing

campaign" or a "label of a consumer product," which other courts have found to justify an

inference of reliance.  In re Hardieplank, 2018 WL 262826, at *17.  Moreover, as CareFirst

points out, at least some CareFirst customers received their insurance by virtue of their

employment or their spouses' employment and did not choose CareFirst in reliance on any

particular representations concerning privacy protections.  For instance, Curt Tringler stated in

his deposition that CareFirst was "offered to [him] by [Allegheny] County by virtue of [his]

employment," that is, that he did not "have a choice as to whether to contract with CareFirst as

[his] healthcare provider."  Mot. for Class Cert., Ex. 12 at 16.  Plaintiffs have not, thus far,

addressed whether the distinction between potential class members who chose CareFirst in the

insurance marketplace and those who did not might make a difference with respect to inferring classwide reliance.

Again, the Court does not here conclude that Plaintiffs cannot satisfy Rule 23(b)(3)'s predominance requirement. But on the current record and briefing, the Court cannot say that Plaintiffs have met their burden either.

### 2. *Superiority*

Last, the Court will briefly address Rule 23(b)(3)'s requirement that class treatment be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The superiority requirement ensures that resolution by class action will 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable consequences.'" Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd., 246 F.R.D. 349, 359–60 (D.D.C. 2007) (alteration in original) (quoting Amchem, 521 U.S. at 615).

Setting aside the predominance concerns just discussed, which suggest possible "difficulties in managing" the case as a class action, Fed. R. Civ. P. 23(b)(3), the Court sees no reason why a class action would not be the superior mode of bringing these claims. The "size of the putative class makes joinder of individual parties impracticable," and because class members' damages, even under Plaintiffs' calculations, would amount at most only to a few thousand dollars apiece, it "is also likely that the economic stake of each putative Plaintiff would be too small to suggest individual suits should be brought." Johnson, 248 F.R.D. at 57; see Mot. for Class Cert. Ex. 7 at 12 (suggesting damages of about $2,500 per person, plus $30 per hour spent on mitigation). Combined with the fact that all of the class members' claims relate to the same underlying conduct—CareFirst's representations and promises about privacy combined

with the data breach—the economies of scale support the conclusion that class treatment here is superior to individual lawsuits, provided that the Court will not need to undertake the individualized inquiries as to injury, causation, and reliance discussed above.[6]

*     *     *

For the foregoing reasons, the Court cannot conclude that Plaintiffs have satisfied Rule 23(b)(3)'s predominance requirement at this juncture.  But because the Court's conclusion is based largely on the potential implications of TransUnion, which neither party discusses and which could require a modification to the class definitions, the Court will permit Plaintiffs to file a renewed motion for class certification that addresses these concerns.  In particular, a renewed motion should address whether the proposed classes must be redefined to avoid sweeping in large numbers of individuals with no Article III injury, whether classes so redefined would suffer from the individualized proof problems discussed above, and whether classwide reliance can be presumed or inferred for Plaintiffs' MCPA and VCPA classes.

---

[6] CareFirst's argument that Plaintiffs cannot bring a VCPA class action in federal court because Virginia courts do not generally permit class actions as a procedural matter does not hold up.  Opp. at 37–38.  Under the Erie doctrine, Federal Rule of Civil Procedure 23 would trump any Virginia procedural rule respecting the availability of class actions.  See In re Hardieplank Fiber Cement Siding Litig., No. 12-MD-2359, 2013 WL 3717743, at *17 (D. Minn. July 15, 2013) (denying motion to dismiss VCPA class action allegations because "the lack of a class action mechanism [under Virginia law] is a procedural matter, rather than a substantive law defining the types of rights and remedies available under the VCPA itself").

**IV.   Conclusion**

For these reasons, it is hereby

**ORDERED** that [Dkt. No. 89] Plaintiffs' Motion for Class Certification is DENIED

without prejudice to renewal.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>March 28, 2023</u>